POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL SCHRAMKE, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| NEKTAR THERAPEUTICS, HOWARD W. ROBIN, SANDRA GARDINER, and JONATHAN ZALEVSKY, | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Michael Schramke ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nektar Therapeutics ("Nektar" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff

believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Nektar securities between February 26, 2025 and December 15, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Nektar is a biopharmaceutical company focused on discovering and developing therapies that selectively modulate the immune system to treat autoimmune disorders. The Company's lead product candidate is rezpegaldesleukin (a/k/a REZPEG or NKTR-358), a novel, first-in-class regulatory T cell stimulator for the treatment of, *inter alia*, alopecia areata.

3.      In March 2024, Nektar initiated its Phase 2b REZOLVE-AA trial, which was purportedly designed to evaluate rezpegaldesleukin in ninety-four patients with severe-to-very severe alopecia areata who had not previously been treated with a Janus kinase ("JAK") inhibitor or another biologic.  The trial's enrollment criteria purportedly included a diagnosis of severe-to-very severe alopecia areata as measured using the Severity of Alopecia Tool ("SALT") score at both screening and randomization, as well as exclusion of patients who had experienced an unstable course of alopecia areata over the prior six months, had inadequate washout of prior alopecia areata treatments within eight weeks, or who had diffuse alopecia or other forms of alopecia.

2

4.      In February 2025, Nektar announced that it had completed its target enrollment in the REZOLVE-AA trial.  At all relevant times, Defendants maintained that enrollment in the trial had followed applicable instructions and protocol standards, while also touting the Company's purported drug development expertise and use of this expertise to advance its product candidates through clinical development.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) enrollment in the REZOLVE-AA trial had not followed applicable instructions and protocol standards; (ii) the foregoing was likely to have a significant negative impact on the REZOLVE-AA trial's results; (iii) accordingly, the REZOLVE-AA trial's overall integrity and prospects were overstated; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.      The truth began to emerge on December 16, 2025, when Nektar issued a press release during pre-market hours "announc[ing] topline results from the 36-week induction treatment period of the Phase 2b REZOLVE-AA trial of investigational rezpegaldesleukin[.]" The press release disclosed that the trial failed to reach statistical significance, which Nektar attributed to the inclusion of four patients who should not have been eligible to participate.

7.      On this news, Nektar's stock price fell $4.14 per share, or 7.77%, to close at $49.16 per share on December 16, 2025.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Nektar is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Nektar securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Nektar is a Delaware corporation with principal executive offices located at 455 Mission Bay Boulevard South, San Francisco, California 94158.  The Company's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "NKTR".

15.     Defendant Howard W. Robin ("Robin") has served as Nektar's Chief Executive Officer, President, and a Director of the Company at all relevant times.  During the Class Period,

4

Defendant Robin sold 46,986 shares of Nektar common stock, enriching himself by nearly $1 million.

16.    Defendant Sandra Gardiner ("Gardiner") has served as Nektar's Interim Chief Financial Officer at all relevant times.

17.    Defendant Jonathan Zalevsky ("Zalevsky") has served as Nektar's Chief Research and Development Officer at all relevant times.

18.    Defendants Robin, Gardiner, and Zalevsky are collectively referred to herein as the "Individual Defendants".

19.    The Individual Defendants possessed the power and authority to control the contents of Nektar's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Nektar's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Nektar, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.    Nektar and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

21.    Nektar is a biopharmaceutical company focused on discovering and developing therapies that selectively modulate the immune system to treat autoimmune disorders. The

Company's lead product candidate is rezpegaldesleukin (a/k/a REZPEG or NKTR-358), a novel, first-in-class regulatory T cell stimulator for the treatment of, *inter alia*, alopecia areata.

22. In March 2024, Nektar initiated its Phase 2b REZOLVE-AA trial, which was purportedly designed to evaluate rezpegaldesleukin in ninety-four patients with severe-to-very severe alopecia areata who had not previously been treated with a JAK inhibitor or other biologic. The trial's enrollment criteria purportedly included a diagnosis of severe-to-very severe alopecia areata as measured using the SALT score at both screening and randomization, as well as exclusion of patients who had experienced an unstable course of alopecia areata over the prior six months, had inadequate washout of prior alopecia areata treatments within eight weeks, or who had diffuse alopecia or other forms of alopecia.

23. At all relevant times, Defendants maintained that enrollment in the REZOLVE-AA trial had followed applicable instructions and protocol standards, while also touting the Company's purported drug development expertise and use of this expertise to advance its product candidates through clinical development.

### Materially False and Misleading Statements Issued During the Class Period

24. The Class Period begins on February 26, 2025, when Nektar issued a press release during pre-market hours announcing that it "has completed target enrollment in its REZOLVE-AA Phase 2b trial of rezpegaldesleukin in patients with severe-to-very-severe alopecia areata." The press release stated, in relevant part:

> Enrollment criteria in the study included a diagnosis of severe-to-very-severe alopecia areata (≥ 50% scalp involvement) as measured using the SALT score at both screening and randomization. Patients who experienced an unstable course of alopecia areata over the last 6 months per investigator assessment were excluded from the study. Patients with diffuse alopecia and other forms of alopecia were also excluded.

25. On March 12, 2025, Nektar hosted a conference call with investors and analysts to discuss its financial and operating results for the fourth quarter ("Q4") and full year ("FY") of

2024.  During that call, Defendant Robin represented that there are "unique operational features of our studies that are designed to minimize clinical operational risk."

26.    During the same call, with specific respect to the REZOLVE-AA trial, Defendant Zalevsky stated, in relevant part[1]:

> Last month, we announced enrollment completion for our 90-patient Phase 2b study in alopecia areata. The trial recruited patients across approximately 30 global sites. ***Patients had to present with severe-to-very-severe disease to find at SALT 50 to SALT 100 for at least six months in order to be eligible for inclusion.***

27.    On March 14, 2025, Nektar filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K").  The 2024 10-K, *inter alia*, touted Nektar's purported "expertise to develop novel drug candidates."

28.    The 2024 10-K likewise repeatedly asserted that Nektar "use[s its] drug development expertise to advance [its] molecules through . . . clinical development."

29.    Appended as exhibits to the 2024 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Robin and Gardiner certified, in relevant part, that the 2024 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

30.    On May 8, 2025, Nektar hosted a conference call with investors and analysts to discuss its financial and operating results for the first quarter ("Q1") of 2025.  During that call, with respect to the REZOLVE-AA trial, Defendant Zalevsky reiterated that "[p]atients had to

---

[1] All emphases herein are added unless otherwise indicated.

present with severe to very severe disease define the severity of Alopecia Tool score or SALT 50 to SALT 100 for at least six months in order to be eligible for inclusion."

31.     The next day, Nektar filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2025 (the "Q1 2025 10-Q").  The Q1 2025 10-Q contained the same statements as referenced in ¶¶ 27-28, *supra*, regarding Nektar's purported expertise in drug development.

32.     Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Robin and Gardiner.

33.     On July 2, 2025, Nektar issued a press release announcing that it had closed an underwritten public offering of $115 million worth of its common stock (the "July 2025 Offering").  In the July 2025 Offering, Defendants sold 4,893,618 shares of Nektar's common stock, which included 638,298 shares sold upon exercise in full by the underwriters of their option to purchase additional shares of common stock in the offering.  Defendants sold these shares at a public offering price of $23.50 per share for gross proceeds of approximately $115 million, before deducting underwriting discounts and commissions and estimated offering expenses.

34.     On July 29, 2025, Nektar issued a press release announcing that the U.S. Food and Drug Administration had granted Fast Track designation for rezpegaldesleukin for the treatment of severe-to-very severe alopecia areata in adults and pediatric patients twelve years of age and older who weigh at least forty kilograms.  The press release stated, in relevant part:

> The REZOLVE-AA . . . study enrolled approximately 90 patients with severe-to-very severe alopecia areata who have not previously been treated with a JAK inhibitor or other biologic.
>
> \* \* \*
>
> Enrollment criteria in the study included a diagnosis of severe-to-very severe alopecia areata (≥ 50% scalp involvement) as measured using the SALT score at both screening and randomization. Patients who experienced an unstable course of alopecia areata over the last 6 months per investigator assessment were excluded

from the study. Patients with diffuse alopecia and other forms of alopecia were also excluded.

35.    On August 7, 2025, Nektar hosted a conference call with investors and analysts to discuss its financial and operating results for the second quarter ("Q2") of 2025.  During the call, Defendant Zalevsky stated the following regarding the progress and prospects of the REZOLVE-AA trial:

> The Phase IIb REZOLVE-AA trial completed enrollment in February and we're excited to share top line results in December. In this trial, in patients with severe to very severe alopecia areata, REZPEG is being evaluated at doses of 18 microgram per kilogram or 24 microgram per kilogram every 2 weeks versus placebo.

> A total of 94 patients were enrolled and the week 36 primary endpoint in the study is the mean percent improvement in SALT score. Now keep in mind that alopecia areata is another dermal disease. And so our results in atopic dermatitis and also reinforced by an earlier separate study in psoriasis point to this T regulatory cell mechanism having strong signals of efficacy in dermatological settings.

36.    The next day, Nektar filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 30, 2025 (the "Q2 2025 10-Q").  The Q2 2025 10-Q contained the same statements as referenced in ¶¶ 27-28, *supra*, regarding Nektar's purported expertise in drug development.

37.    Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Robin and Gardiner.

38.    On November 6, 2025, Nektar hosted a conference call with investors and analysts to discuss its financial and operating results for the third quarter ("Q3") of 2025.  During the call, Defendant Robin continued to tout the progress and prospects of the REZOLVE-AA trial, stating, in relevant part:

> Importantly, in December, we plan to present the top line results from the Phase IIb RESOLVE-AA study in patients with alopecia areata. This study enrolled approximately 90 patients with severe to very severe alopecia areata with strong Phase II results in the dermatological setting of atopic dermatitis, we're optimistic about the second dermatological setting for REZPEG.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

39.     During the same call, Defendant Zalevsky likewise touted the progress and prospects of the REZOLVE-AA trial, while also making various representations regarding the eligibility criteria and screening performed to ensure proper enrollment in the trial, stating, in relevant part:

> And now turning to alopecia areata. We are on track and look forward to reporting data from the Phase IIb study in December of this year. A positive outcome here would reinforce the potential of REZPEG to provide a completely new treatment paradigm for patients with chronic dermatological diseases. The RESOLVE-AA trial was initiated in March 2024. A total of 94 patients with severe to very severe alopecia areata who have not received a JAK inhibitor or other biologic were randomized to 2 different dose regimens of REZPEG . . . .

> As a reminder, patient eligibility for this study was determined using the SALT score, both screening and randomization. Patients who experienced an unstable course of alopecia areata over the last 6 months per investigator assessment were excluded from the study and patients with diffuse alopecia and other forms of alopecia were also excluded.

40.     On November 7, 2025, Nektar filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q3 ended September 30, 2025 (the "Q3 2025 10-Q").  The Q3 2025 10-Q contained the same statements as referenced in ¶¶ 27-28, *supra*, regarding Nektar's purported expertise in drug development.

41.     Appended as exhibits to the Q3 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 29, *supra*, signed by Defendants Robin and Gardiner.

42.     The statements referenced in ¶¶ 24-32 and 34-41 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) enrollment in the REZOLVE-AA trial had not followed applicable instructions and protocol standards; (ii) the foregoing was likely to have a significant negative impact on the REZOLVE-AA trial's results; (iii) accordingly, the REZOLVE-AA trial's overall integrity and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

prospects were overstated; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

43.    In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Nektar to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose, *inter alia*, issues with enrollment in the REZOLVE-AA trial, and/or that trial's true integrity and prospects, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Begins to Emerge**

44.    The truth began to emerge on December 16, 2025, when Nektar issued a press release during pre-market hours "announc[ing] topline results from the 36-week induction treatment period of the Phase 2b REZOLVE-AA trial of investigational rezpegaldesleukin[.]" The press release disclosed that the trial failed to reach statistical significance, which Nektar attributed to the inclusion of four patients who should not have been eligible to participate, stating, in relevant part:

> The primary endpoint narrowly missed statistical significance with the mean percent SALT reduction at Week 36 of 28.2% for the 24 µg/kg rezpegaldesleukin arm, 30.3% for the 18 µg/kg rezpegaldesleukin arm, and 11.2% for placebo (p=0.186 and p=0.121, respectively) . . . .
>
> Four of 92 patients included in the modified intent-to-treat (mITT) analysis were found to have major study eligibility violations that should have disqualified them for randomization into the trial.
>
> Both rezpegaldesleukin treatment arms met statistical significance on the primary endpoint when excluding the four patients with major study eligibility violations.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

45.     The same day, Nektar hosted a conference call with investors to discuss the REZOLVE-AA trial results.  During that call, the Company's Chief Medical officer provided additional information regarding the four patients with major study eligibility violations, stating, in relevant part:

> 2 of the 4 patients, 1 on placebo and 1 on REZPEG 24 micrograms per kilogram had unstable alopecia areata with their initial disease being diagnosed less than 6 months prior to randomization. So why is this important? Alopecia areata is considered unstable when patients have a diagnosis for less than 6 months because of the unpredictable nature of its autoimmune response, which can fluctuate in the early months with periods of hair loss and regrowth. Therefore, it's standard practice to exclude these patients from AA [alopecia areata] studies.

> There were also 2 additional patients excluded in this analysis who initiated treatment before completing the prerequisite 8-week washout period for other AA medications. This included 1 patient on REZPEG 18 micrograms per kilogram and 1 patient on 24.

46.     Following these disclosures, Nektar's stock price fell $4.14 per share, or 7.77%, to close at $49.16 per share on December 16, 2025.  Indeed, analysts attributed this sharp decline in Nektar's stock price explicitly to the inclusion of the four patients who should not have been eligible to participate in the REZOLVE-AA trial.

47.     For example, also on December 16, 2025, Piper Sandler issued a report stating that Nektar "is currently trading down given n=4 patients had major study eligibility violations," whereas BTIG issued a report stating that "[w]e believe the muted stock reaction despite high dose REZPEG meeting our blue sky scenario" was "explained solely by" the inclusion of the four patients with major study eligibility violations.  The same day, Jefferies, Oppenheimer, H.C. Wainwright, William Blair, and Citi likewise issued reports concerning the REZOLVE-AA trial results, with each commenting on the inclusion of the four ineligible participants in the trial.

48.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SCIENTER ALLEGATIONS**

49.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Nektar securities, Defendant Robin enriched himself by nearly $1 million by selling tens of thousands of shares of the Company's common stock.  Likewise, during the Class Period, Defendants sold millions of shares of Nektar common stock to investors via the July 2025 Offering for gross proceeds of approximately $115 million.  Moreover, Defendants Robin and Zalevsky earned bonuses of $976,131 and $431,885, respectively, as part of Nektar's 2024 annual incentives program, each of which was awarded based upon, *inter alia*, the Company's progress in advancing its rezpegaldesleukin programs, including completing enrollment in the REZOLVE-AA trial.

50.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Rezpegaldesleukin is Nektar's lead product candidate.  Defendants were thus undoubtedly highly focused on every aspect of the REZOLVE-AA trial, including the enrollment of the trial's participants, as evidenced by their repeated, detailed statements concerning this topic throughout the Class Period, as outlined *supra*.  Defendants' clear attentiveness to the enrollment of participants in the REZOLVE-AA trial is further supported by their 2024 annual bonus criteria and awards, as detailed in the 2024 10-K.  For example, Defendants Robin's and Zalevsky's respective 2024 annual bonus performance goals included, *inter alia*, "[m]aintain[ing] schedule for [the] Phase 2b study of rezpegaldesleukin in alopecia areata[.]"  Further, per the 2024 10-K, Defendant Robin's individual performance highlights in support of his 2024 bonus award included, among other things, how he had "[f]ocused the Company on maintaining the development timelines of rezpegaldesleukin to ensure top-line readouts in 2025[,]" whereas

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Zalevsky's included, *inter alia*, "maintaining on-track enrollment of our clinical trial[] in . . . alopecia areata."  Ensuring target enrollment in the REZOLVE-AA trial was, therefore, undoubtedly top of mind for these Individual Defendants.

51.    Further, throughout the Class Period, as detailed *supra*, Defendants made repeated assurances regarding Nektar's "expertise to develop novel drug candidates" and its use of this expertise to advance its product candidates, including rezpegaldesleukin, through clinical development.  Defendants, therefore, were presumably highly knowledgeable about the technical aspects of the REZOLVE-AA trial, including its enrollment criteria, and aware of the misleading nature of their statements regarding the trial throughout the Class Period.

52.    Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers and/or acquirers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Nektar securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nektar securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nektar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nektar;

- whether the Individual Defendants caused Nektar to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Nektar securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

59.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Nektar  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Nektar securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

60.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

61.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

62.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Nektar securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Nektar securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Nektar securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nektar's finances and business prospects.

66.     By virtue of their positions at Nektar, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

67.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Nektar, the Individual Defendants had knowledge of the details of Nektar's internal affairs.

68.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nektar. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nektar's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

18

the market price of Nektar securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Nektar's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Nektar securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

69.    During the Class Period, Nektar securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nektar securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Nektar securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Nektar securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

70.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

72.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     During the Class Period, the Individual Defendants participated in the operation and management of Nektar, and conducted and participated, directly and indirectly, in the conduct of Nektar's business affairs.  Because of their senior positions, they knew the adverse non-public information about Nektar's misstatement of income and expenses and false financial statements.

74.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nektar's financial condition and results of operations, and to correct promptly any public statements issued by Nektar which had become materially false or misleading.

75.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nektar disseminated in the marketplace during the Class Period concerning Nektar's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nektar to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Nektar within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nektar securities.

76.     Each of the Individual Defendants, therefore, acted as a controlling person of Nektar.  By reason of their senior management positions and/or being directors of Nektar, each

20

1   of the Individual Defendants had the power to direct the actions of, and exercised the same to

2   cause, Nektar to engage in the unlawful acts and conduct complained of herein.  Each of the

3   Individual Defendants exercised control over the general operations of Nektar and possessed the

4   power to control the specific activities which comprise the primary violations about which

5   Plaintiff and the other members of the Class complain.

6          77.    By reason of the above conduct, the Individual Defendants are liable pursuant to

7   Section 20(a) of the Exchange Act for the violations committed by Nektar.

8                                **PRAYER FOR RELIEF**

9          **WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

10         A.     Determining that the instant action may be maintained as a class action under Rule

11  23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

12         B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by

13  reason of the acts and transactions alleged herein;

14         C.     Awarding Plaintiff and the other members of the Class prejudgment and post-

15  judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

16         D.     Awarding such other and further relief as this Court may deem just and proper.

17                             **DEMAND FOR TRIAL BY JURY**

18         Plaintiff hereby demands a trial by jury.

19  Dated: March 6, 2026                    Respectfully submitted,

20                                          POMERANTZ LLP

21                                          */s/ Jennifer Pafiti*
                                            Jennifer Pafiti (SBN 282790)
22                                          1100 Glendon Avenue, 15th Floor
                                            Los Angeles, California 90024
23                                          Telephone: (310) 405-7190
                                            jpafiti@pomlaw.com

24

25

26

27

28

21

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS