POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Lead Plaintiff Michael Schramke and the Proposed Class*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL SCHRAMKE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEKTAR THERAPEUTICS, et al.,<br><br>Defendants. | Case No.: 5:26-cv-01951-PCP<br><br>**CLASS ACTION**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

Page


NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 5

PARTIES ........ 6

SUBSTANTIVE ALLEGATIONS ........ 7

- I. Background ........ 7
- II. Materially False and Misleading Statements Issued During the Class Period ........ 17
- III. The Truth Begins to Emerge As Nektar Discloses REZOLVE-AA Failed to Achieve A Statistically Significant Response Due to Ineligible Patients ........ 25
- IV. Additional Allegations of Scienter ........ 28
  - A. Defendants had actual knowledge of and access to information contradicting their public statements ........ 28
  - B. Defendants Held Themselves Out As Knowledgeable on Patient Enrollment and Exclusion Criteria ........ 29
  - C. Core Operations ........ 30
  - D. The Defendants Were Motivated to Commit Fraud Due to the Precarious Position of the Company ........ 31
  - E. Robin and Zalevsky's Insider Sales and Compensation Packages Boost an Inference of Fraud ........ 31
  - F. The Temporal Proximity and Sharp Divergence Between Defendants' Misleading Statements and the Emergence of the Truth Further Bolsters an Inference of Scienter ........ 34

PLAINTIFF'S CLASS ACTION ALLEGATIONS ........ 34

COUNT I (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ........ 37

COUNT II (Violations of Section 20(a) of the Exchange Act Against Robin and Zalevsky) ........ 39

PRAYER FOR RELIEF ........ 40

DEMAND FOR TRIAL BY JURY ........ 41

Lead Plaintiff Michael Schramke ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (as defined below), alleges the following, based upon personal knowledge as to Plaintiff and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of conference calls Defendants held with analysts and investors, public announcements made by the Defendants, Defendants' filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by and regarding Nektar Therapeutics ("Nektar" or the "Company"), analysts' reports and advisories about the Company, articles about Defendants and their industry in financial publications or other news outlets, regulatory filings, interviews with knowledgeable former employees of the Company, and information readily obtainable on the Internet.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf a Class consisting of all persons who purchased or otherwise acquired Nektar securities between November 8, 2024 and December 15, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials. Excluded from the Class are: Defendants, as defined herein, former and current officers, senior managers, and directors of Nektar, any entity in which any of the Defendants (alone or in combination with other Defendants) have or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

2. Nektar is a biopharmaceutical company focused on discovering and developing therapies that selectively modulate the immune system to treat autoimmune disorders. The

Company's lead product candidate is rezpegaldesleukin ("REZPEG" or "NKTR-358"), a novel, first-in-class regulatory T-cell stimulator for the treatment of, *inter alia*, alopecia areata. Alopecia areata is an autoimmune disease characterized by patchy hair loss on the scalp, face, and/or the body.

3. It has been over ten years since Nektar last had a commercial product receive approval from the Food and Drug Administration ("FDA"). From 2018 through 2023, Nektar placed substantial strategic emphasis on two large pharmaceutical partnerships—Eli Lilly for REZPEG and Bristol Myers Squibb ("BMS") for NKTR-214 (bempegaldesleukin). The two deals were important sources of upfront cash and were presented by Nektar as a way to fund broad development while reducing the Company's need to bear all development costs itself. Although the Company was able to sustain its operations through the influx of cash from these partnerships, BMS and Eli Lilly terminated their joint development programs with Nektar in 2022 and 2023, respectively. As a result of these setbacks, the Company underwent a series of layoffs, cutting approximately 90% of its workforce from 2022 to 2024.

4. In the four years leading up to the Class Period, Nektar lost over a billion dollars. Its losses only worsened as the Company entered 2024. With limited options remaining, the Company prioritized REZPEG, despite its previous lack of success with Eli Lilly.

5. In March 2024, Nektar initiated its Phase 2b REZOLVE-AA trial, which was designed to evaluate REZPEG in approximately 90 patients with severe-to-very severe alopecia areata who had not previously been treated with a Janus kinase ("JAK") inhibitor or another biologic. According to the trial's protocol, enrollment was conditioned on patients being: (1) diagnosed with severe alopecia areata for at least six continuous months and (2) washed out of all other alopecia areata treatments for at least eight weeks. The protocol requirement that patients needed to have severe alopecia areata for at least six months was important because alopecia areata can be unstable in its early course, meaning that patients can spontaneously regrow hair without treatment. Also, the washout requirement was critical because effects from another treatment could confound the measurement of REZPEG's own effect on hair regrowth.

Failure to meet those conditions, as the Company explained multiple times, meant that the patient was not eligible for the trial.

6. The trial's enrollment criteria included a diagnosis of severe-to-very severe alopecia areata as measured using the Severity of Alopecia Tool ("SALT") score at both screening and randomization. To be included, the protocol (prepared by Nektar and submitted for review to the FDA) had black-and-white inclusion and exclusion criteria. As explained in the publicly available eligibility criteria on the FDA website, to be included, a patient, among other things, had to have "[d]ocumented history" of the disease for "over 6 months with no spontaneous improvement prior to baseline." *See* https://clinicaltrials.gov/study/NCT06340360 ?viewType=Card&cond=Alopecia%20Areata&page=10&rank=96. And as the Company confirmed later, the protocol always required the exclusion of patients who had taken another alopecia areata treatment within the prior eight weeks before enrollment, or who had diffuse alopecia or other forms of alopecia. In order to be eligible for the trial, patients had to have had a SALT score of at least 50% (meaning 50% hair loss on the scalp) for six continuous months prior to enrollment and randomization.

7. In February 2025, Nektar announced that it had completed its target enrollment in the REZOLVE-AA trial. At all relevant times, Defendants maintained that enrollment in the trial had followed applicable instructions and protocol standards, while also touting the Company's purported drug development expertise and use of this expertise to advance its product candidates through clinical development.

8. Throughout the Class Period, Defendants touted the prospects of the REZOLVE-AA, including that it had undergone vigorous screening procedures. Defendants assured investors that enrollment had been "completed on schedule" and Defendants had excluded patients who had been ineligible due to the Company's screening procedures, including that they had excluded patients who had severe alopecia areata for fewer than six months. At all times during the Class Period, the Company downplayed any concerns about enrollment or monitoring

of patients, while concealing widespread enrollment problems and enrolling patients that were not eligible.

9. Defendants knew, or recklessly disregarded that the statements about patient enrollment were misleading when made. Defendants were motivated to conceal the damaging facts about ineligible patients in the study because Nektar faced crushing financial pressure after a decade without an FDA-approved drug, losses of several hundreds of million dollars annually, and a looming cash crisis. Defendants exploited the misleading statements about enrollment to raise nearly $200 million combined in a secondary offering in July 2025 and subsequent At-The-Market offering in September and October of 2025, which provided the Company with needed capital to continue its operations. Meanwhile, while concealing these enrollment problems from investors, the Company's CEO Howard W. Robin ("Robin") and its Chief Research and Development Officer Jonathan Zalevsky ("Zalevsky") profited handsomely from insider sales. During the Class Period, Robin sold nearly 20,000 shares for over $787,000; he had not sold any shares during the same time period before the Class Period, other than to cover tax withholdings. Meanwhile, Zalevsky sold over 2,000 shares for over $72,000; like Robin, he had not sold any shares during the same time period before the Class Period, other than to cover tax withholdings. Defendants Zalevsky and Robin were also motivated by their own incentive compensation metrics to conceal any problems in REZPEG's development from investors.

10. Defendants had both actual knowledge of and access to information confirming that there were ineligible patients in the study, because they closely monitored patient data. The Company's medical monitor during the Class Period, frequently reviewed the patient data, and reported to the Chief Medical Officer. *See* ¶93, *infra*. REZPEG, and its clinical development, was the core operation of the Company at all relevant times. And REZOLVE-AA was one of only two key studies on which the Company was wagering its survival. Defendants also made multiple public statements indicating their actual knowledge of REZOLVE-AA's eligibility requirements and claimed to closely monitor patient data. Their detailed public statements and

responses to questions about enrollment and screening further support the inference that they knew or recklessly disregarded REZOLVE-AA's eligibility problems.

11. That Defendants made false and misleading statements in close temporal proximity to extremely adverse disclosures also bolsters the inference of scienter. As late as November 2025, and just five weeks before the REZOLVE-AA data was disclosed, Defendants assured investors that Nektar had appropriately screened out patients with unstable disease in REZOLVE-AA. Five weeks later, Nektar disclosed that the trial had failed to achieve statistical significance due specifically to its failure to screen out ineligible patients.

12. The truth began to emerge on December 16, 2025, when Nektar issued a press release during pre-market hours "announc[ing] topline results from the 36-week induction treatment period of the Phase 2b REZOLVE-AA trial of investigational rezpegaldesleukin[.]" The press release disclosed that the trial failed to reach statistical significance, which Nektar attributed to the inclusion of four patients who should not have been eligible to participate.

13. On this news, Nektar's stock price fell $4.14 per share, or 7.77%, to close at $49.16 per share on December 16, 2025. Several analysts and industry experts attributed the stock decline to the failure to achieve statistical significance as a result of the ineligible patients' enrollment in the study.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Nektar is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

18. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19. Plaintiff, as set forth in the previously filed Certification, ECF Nos. 7-3, 7-4, acquired Nektar securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

20. Defendant Nektar is a Delaware corporation with principal executive offices located at 455 Mission Bay Boulevard South, San Francisco, California 94158. The Company's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "NKTR".

21. Defendant Robin has served as Nektar's Chief Executive Officer, President, and as a Director of the Company at all relevant times. During the Class Period, Defendant Robin sold nearly 20,000 shares of Nektar common stock at artificially high prices maintained by the misrepresentations and omissions alleged herein, enriching himself by over $787,000.

22. Defendant Zalevsky has served as Nektar's Chief Research and Development Officer at all relevant times. During the Class Period, Defendant Zalevsky sold over 2,000 shares of Nektar common stock at artificially high prices maintained by the misrepresentations and omissions alleged herein, enriching himself by over $72,000.

23. Defendant Mary Tagliaferri ("Tagliaferri") is Nektar's Senior Vice President & Chief Medical Officer ("CMO"). She served in this role from May 2022 until February 2025, when she resigned. She returned to Nektar as CMO in approximately September, 2025.

24. Defendants Robin, Zalevsky, and Tagliaferri are collectively referred to herein as

the "Individual Defendants."

25. The Individual Defendants possessed the power and authority to control, and in the exercise of their day-to-day responsibilities, did control the contents of Nektar's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Nektar's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Nektar, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

26. Nektar and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. Background

27. Nektar is a clinical-stage biopharmaceutical company focused on discovering and developing therapies that selectively modulate the immune system to treat autoimmune disorders. The Company was founded in 1990 under the name Inhale Therapeutic Systems and was initially focused on inhalable pulmonary technology. In 2003, the Company changed its name to Nektar and partnered with several large pharmaceutical companies in the development of drugs. Nektar invented and developed naloxegol, which was then licensed to AstraZeneca, who completed phase 3 development and commercialization under the brand name MOVANTIK, which received FDA approval in September, 2014. In November 2015, the FDA approved ADYNOVATE, which was developed by Bexalta, using Nektar's proprietary technology as an approved biologic to treat Hemophilia. However, Nektar sold its royalty rights to MOVANTIK and ADYNOVATE, as well as several other drugs, in 2020.

28. Nektar currently has no FDA approved drugs on the market.

***2015-2023: Nektar struggles to advance a drug candidate amid clinical trial and partnership setbacks.***

29. During the 2010s, Nektar increasingly shifted focus from commercializing drug delivery technologies to developing clinical-stage immunotherapies. In 2017, bempegaldesleukin (NKTR-214), was its leading immuno-oncology candidate. In 2018, Nektar partnered with BMS, but the program for NKTR-214 ultimately failed to reach endpoints in multiple Phase 3 clinical trials. NKTR-214 was discontinued in 2022, which represented a major setback for Nektar.

30. In response, on April 25, 2022, Nektar initiated a restructuring plan to concentrate on a smaller immunotherapy pipeline. As part of the restructuring plan, the Company laid off 70% of its workforce. In Fiscal Year 2022, Nektar's workforce dropped from over 700 employees to just 216. The Company said that with the cost reductions, it had sufficient cash to last through the middle of 2025.

31. After the failure of NKTR-214, REZPEG became the Company's lead product candidate. REZPEG (formerly NKTR-358) was invented by Nektar and had reached the clinical trial stage by April, 2018, when the Company initiated a Phase 1 trial of REZPEG for the treatment of lupus.

32. REZPEG was developed as a potential first-in-class resolution therapeutic that the Company believed had potential to address underlying immune system imbalance in patients with multiple autoimmune conditions. REZPEG targets the interleukin (IL-2) receptor complex in the body to stimulate proliferation of powerful inhibitory immune cells known as regulatory T-cells. By activating these cells, Nektar sought to bring the immune system back into balance, which the Company believed could lead to a profound clinical impact and healthy organ function in autoimmune conditions.

33. In July 2017, Nektar entered into a global collaboration and licensing agreement with Eli Lilly for the development and commercialization of REZPEG. Under the terms of the agreement, Nektar received an upfront payment of $150 million and was eligible to receive up

to an additional $250 million for certain development and regulatory milestones. While Eli Lilly would ultimately be fully responsible for global commercialization of the drug, Nektar could copromote REZPEG in the United States if certain conditions were met. Nektar and Eli Lilly were to share the costs: Nektar would cover Phase 1 developments costs and 25% of Phase 2 trial costs and Eli Lilly would cover the other 75%. In 2019, after collaboration began, Eli Lilly initiated Phase 1b studies of REZPEG for the treatment of atopic dermatitis (eczema) and psoriasis.

34. After positive trial results for lupus were reported at medical conferences in 2019-2020, Eli Lilly launched a Phase 2 trial for REZPEG as a treatment for lupus in mid-2020, targeting a more severe lupus population than had been enrolled previously. The trial for moderate to severe eczema was completed and data were presented between late 2021 and mid-2022. Nektar claimed that the trial showed improvements from baseline in multiple symptom scales in a dose-dependent manner after 12 weeks of treatment, and that these effects were maintained in some patients through 48 weeks of follow-up. Though Nektar management thought the data was encouraging enough to advance REZPEG as a treatment for eczema into Phase 2, Eli Lilly opted not to move forward with that indication. And, another Phase 2 trial Eli Lilly had begun in early 2021 to test the drug as a treatment for moderately to severely active ulcerative colitis (UC) was terminated due to enrollment futility, meaning it was unable to enroll enough suitable patients to complete the study.

35. In the Phase 2 lupus study, a mid-2022 interim analysis greenlit continuation of the trial to completion. However, in February 2023, Nektar and Eli Lilly announced the study failed to meet its primary endpoint in either the modified intention-to-treat or per-protocol populations, and as a result, the lupus program would be discontinued.

36. Soon after, in April 2023, Eli Lilly terminated its REZPEG collaboration agreement with Nektar and returned full development and commercialization rights to Nektar. Nektar announced that it was initiating another cost-cutting plan. The Company announced in this cost-cutting disclosure that it would prioritize REZPEG development.

37. The Company then laid off another 60% of its workforce at its San Francisco headquarters. By the end of the year, the Company only had 137 employees. By year-end of 2024, its headcount had diminished to 61, down 90% from its 2021 peak. Nektar claimed that this cost-cutting initiative extended its cash runway to the middle of 2026.

***Nektar Burns Through Over a Billion Dollars Without a Marketable Drug*.**

38. In fact, Nektar was burning through cash at an untenable rate. Nektar's cash position entering 2019 was buoyed by its partnership agreements with major pharmaceutical companies BMS and Eli Lilly. Pursuant to the terms of the BMS agreement, BMS paid Nektar $1 billion upfront and also bought $850 million in Nektar stock. As a result, the Company ended 2019 with $1.6 billion in cash and marketable securities.

39. However, the Company was burning through hundreds of millions of dollars each year without a marketable product. During each year from 2020-2023, the Company reported several hundred million dollars of net losses, and over a billion dollars of operating losses in total. See below:

| Reported Figures (in Millions of U.S. Dollars) | FY 2020 | FY 2021 | FY 2022 | FY 2023 | Total Losses FY2020-2023 |
|---|---|---|---|---|---|
| **Operating Income (Loss)** | ($425.1) | ($446.1) | ($376.2) | ($263.7) | ($1,511) |
| **Net Income (loss)** | ($444.4) | ($523.8) | ($368.2) | ($276.1) | ($1,613) |

40. As a result, the Company's cash and marketable securities balance rapidly diminished:

| Cash and Marketable Securities as of | Reported in | Cash & Marketable Securities (in millions) |
|---|---|---|
| December 31, 2019 | FY 2019 Form 10-K | $1,604 |
| December 31, 2020 | FY 2020 Form 10-K | $1,199 |
| December 31, 2021 | FY 2021 Form 10-K | $798.8 |
| December 31, 2022 | FY 2022 Form 10-K | $505.0 |
| December 31, 2023 | FY 2023 Form 10-K | $329.4 |

41. Meanwhile, Nektar's cash and cash equivalents (excluding marketable securities) from 2020 to 2023 fell from $199 million to just $35 million. The Company resorted to selling off stakes in future royalties to prolong its survival, including the $150 million in future royalties on previously approved drugs in December 2020. Later, in March 2024, Nektar also sold all its reversionary rights in connection with this sale for an additional $15 million.

***September 2023-March 2024: The Company Initiates New Clinical Trials as It is Running out of Money.***

42. After Eli Lilly had terminated its partnership with Nektar for the development of REZPEG, the Company decided to pursue clinical trials for the drug Eli Lilly rejected at its own full cost. The Company initiated an eczema study in October 2023. On November 7, 2023, the Company announced that it intended to initiate an alopecia study, with a data readout expected in the first half of 2025. Robin emphasized that "[w]e've made significant progress across our pipeline, including initiating a Phase 2b atopic dermatitis study in October and completing plans to start a Phase 2b alopecia areata study in early 2024."

43. On March 5, 2024, the Company announced that it had commenced its Phase 2b

REZOLVE-AA study. Alopecia areata (the "AA" in REZOLVE-AA) is an autoimmune disorder that causes distinct patterns of hair loss, usually as small round or patchy bald lesions on the scalp. Essentially, the patient's immune system mistakenly attacks hair follicles. Normally, hair follicles are "immune privileged," meaning that the immune system does not attack hair follicles. In alopecia areata, that protection breaks down, and the immune system starts attacking hair follicles as if they were a threat. These immune system attacks on the hair follicles cause hair loss, often in round patches on the scalp, and can also cause the loss of eyebrows and eyelashes as well as body hair. However, hair can grow back when the attacks stop.

44. At that time, JAK inhibitors were the standard of care for treating alopecia areata. But these existing treatments all had a major drawback: they decrease the activity of the immune system, which creates unintended side effects. At the time REZOLVE-AA was commenced, two JAK inhibitors, baricitinb (Olumiant) and ritlecitinib (Litfulo) were FDA-approved for alopecia areata, both daily pills. In July 2024, a third JAK inhibitor, Leqselvi (deuruxolitinib), was also approved. All blocked immune signaling broadly rather than targeting only the cause of hair loss. As a result, they left the body vulnerable to infections, requiring careful medical monitoring. The JAK inhibitors also did not address the underlying immune imbalance, therefore hair loss often returns when treatment stops.

45. REZPEG, on the other hand, was designed to fix the actual imbalance causing the disease. REZPEG is a modified form of the immune protein called interleukin-2 (IL-2), which was specifically designed to boost regulatory T-Cells. T-cells are cells designed to calm the immune system. When those T-cells are not sufficient, the immune system becomes overactive and attacks hair follicles.

46. Nearly 6.7 million people in the U.S. and 160 million worldwide develop alopecia areata in their lifetime. About 700,000 people in the U.S. currently have some form of alopecia areata. According to Nektar, because of the overall immune system concerns with JAK inhibitors, dermatologists were hesitant to prescribe JAK inhibitors. The Company stressed that this hesitance created a significant opportunity for the Company, if REZOLVE-AA was successful.

In the lead-up to the trial's data readout, the Company emphasized that it was seeking to show that REZPEG could match the results of low dose (2 mg) Olumiant, an approved JAK inhibitor. Analysts also agreed that this was the benchmark for success. *See* ¶80, *infra*.

47. Nektar specified that the primary efficacy endpoint for REZOLVE-AA was the mean percent improvement in SALT at Week-36, with the efficacy assessed by measuring the improvement in the REZPEG doses compared to those of placebo. As announced, secondary endpoints were to include the proportion of participants with greater than or equal to 50% reduction in SALT at Week-36 and other assessed timepoints and mean percent improvement in SALT at other assessed timepoints.

48. SALT is a scoring system doctors used to measure how much a patient has lost in hair. SALT-0 means no hair loss; SALT-100 means complete hair loss, and SALT-50 means 50% hair loss. In Olumiant's clinical trials, BRAVE-AA1 and BRAVE-AA2, the 2 mg dose showed a mean improvement in SALT scores of approximately 24% on a placebo-adjusted basis at Week-36, and just over 16% of patients achieved SALT-20 on a placebo-adjusted basis at that same Week-36 endpoint.[1]

49. The REZOLVE-AA study protocol specified strict inclusion and exclusion criteria. The protocol is submitted to the FDA as a prerequisite to commencing a clinical trial as part of an Investigational New Drug Application ("IND").[2] Also, submitting a protocol is a prerequisite to commencing a study. *See* 21 CFR § 312.30(a). Although INDs are not public, Nektar has explained that the REZOLVE-AA protocols required excluding patients who (1) lacked a documented history of severe alopecia areata for more than six months with no

[1] "Placebo-adjusted" refers to the percent of patients receiving an outcome in the dosed arms minus the percent of patients achieving the same outcome in the placebo arm. For example, the percent of patients reaching SALT-20 with the 2 mg Olumiant doses in the BRAVE-AA1 study was 22.8%; the placebo rate of achieving SALT-20 was 6.2%; thus, the placebo-adjusted percentage reaching SALT-20 was 16.6%, which is derived by subtracting 6.2% from 22.8% to yield a placebo-adjusted rate of 16.6%. *See* https://www.nejm.org/doi/10.1056/NEJMoa2110343

[2] *See* https://www.fda.gov/drugs/investigational-new-drug-ind-application/ind-applications-clinical-investigations-clinical-protocols

spontaneous improvement before baseline, and (2) had received another alopecia areata treatment within the previous eight weeks or (3) diffuse/other forms of alopecia.

50. Because unstable alopecia can lead to spontaneous hair regrowth, the protocol required that patients be diagnosed with severe alopecia for at least six months continually prior to beginning the study. In addition, the Company required that other treatments be washed out (not taken) for a minimum of eight weeks before commencing the study. The washout requirement was critical because effects from another treatment could confound the measurement of REZPEG's own effect on the SALT score in REZOLVE-AA. Failure to satisfy either of those conditions meant that patients were ineligible and had to be excluded from the study. Below is an illustration from the Company of the eligibility criteria for REZOLVE-AA, which it and its senior officers at all times knew and understood:




Source: Nektar Corporate Presentation: Phase 2b REZOLVE-AA Topline Results from 36-Week

Induction Treatment Period, December 16, 2025. Throughout the Class Period, the eligibility criteria remained the same, pursuant to the protocol. As Defendant Tagliaferri later admitted, the inclusion of either (1) patients that were diagnosed fewer than six months prior to randomization in the trial **or** (2) an inadequate washout of other alopecia treatments meant that patients "should never have been enrolled in the trial." *See* ¶83, *infra*.

51. Nektar also publicly posted eligibility requirements on ClinicalTrials.gov, which also expressly required documented history of severe alopecia areata over a six-month period, and specifically excluded the use of other alopecia treatments:

(See next page)

**Criteria**

Inclusion Criteria:

- Adults who are at least 18 years and ≤60 years for males (≤70 years of age for females) old at the time of informed consent
- Diagnosis of Alopecia Areata (AA) severity at screening and baseline:
    1. severe to very severe AA (≥ 50% scalp involvement) as measured using the SALT score
    2. Documented history over 6 months with no spontaneous improvement prior to baseline
    3. Current episode of severe to very severe AA of less than 8 years
- Women of childbearing potential (WOCBP) must have a negative pregnancy test at screening and baseline.
- While on investigational product and for at least 30 days after taking the last dose of investigational product (IP), WOCBP who engage in activity in which conception is possible must use approved highly effective contraceptive method(s). For male patient with partner that is WOCBP in which conception is possible, male patient must agree to use approved highly effective contraceptive method(s).
- Able to complete patient questionnaires
- Able and willing to comply with requested study visits and procedures
- Able and willing to provide written informed consent
- Able to communicate, read and/or understand the local language

Exclusion Criteria:

- Men and women (of reproductive potential) unwilling to use birth control and women who are pregnant or breastfeeding.
- Patient has primarily "diffuse" type AA (characterized by diffuse hair shedding).
- Presence of another form of alopecia.
- Prior use of any of the following treatments:
    1. aldesleukin
    2. investigational IL-2 analog
    3. oral Janus kinase (JAK) inhibitor for any indication, including, but not limited to, baricitinib, upadacitinib, abrocitinib, tofacitinib, and ruxolitinib, whether marketed or investigational
    4. systemic immune-modulating biologic therapy (including, but not limited to, dupilumab, tralokinumab, lebrikizumab, nemolizumab, rocatinlimab, rituximab, ocrelizumab, ofatumumab, belimumab, daxdilimab, etc.) whether marketed or investigational
- History of cancer or lymphoproliferative disease within 5 years prior to Day 1. Note: Patients

*See* https://clinicaltrials.gov/study/NCT06340360?viewType=Card&cond=Alopecia%20Areata &page=10&rank=96&tab=history&a=6#version-content-panel.

52. Analysts relied on the Company's supposed compliance with vigorous screening procedures, and mirrored Defendants' assurances regarding the exclusion criteria. For example, according to a dermatologist expert interviewed in a Piper Sandler analyst report, when asked "What measures did NKTR put into place to ensure success in regard to execution of REZOLVE-AA study", the expert responded "Importantly, we think NKTR's thoughtful design and comprehensive patient selection strategy properly de-risks REZOLVE-AA topline results" and

attributed the Company's supposed careful recruitment selection strategy to the likely success of the study. (*See* Piper Sandler, Nektar Therapeutics (NKTR): Addressing 25 Investor Questions Ahead of Ph2B REZOLVE-AA topline", October 23, 2025.). BTIG credited the Company's "stringent enrollment criteria (SALT≥50, biologic/JAK-naïve) that need to be met both at screening and randomization." (BTIG, Nektar Therapeutics: Enrollment in Rezpeg Phase 2b Study for AA Complete, Topline Results On Track for 4Q25, February 27, 2025). Jefferies also noted that the study required patients to be JAK-inhibitor naïve. (Jefferies, May 9, 2024 Report: NKTR).

53. At no point either before or during the Class Period did Nektar disclose that it was not strictly enforcing the eligibility criteria, that it had allowed ineligible patients to participate in the study, or that it was experiencing enrollment problems of any kind.

54. In November, 2024, the Company announced it was selling its commercial manufacturing facility in Huntsville, Alabama, for $90 million, which included $70 million in cash and $20 million in equity in the buyer, Ampersand Capital Partners. By the end of Third Quarter of 2024, cash and marketable securities had fallen to $249.1 million, declining just under a billion dollars in only four years.

## II. Materially False and Misleading Statements Issued During the Class Period

55. The Class Period begins on November 8, 2024, the next trading day after the Company held its investor call to report results for the Third Quarter of 2024. On November 7, 2024, after the close of trading, the Company announced that it was extending the data readout date of REZOLVE-AA from the first half of 2025 to the second half of 2025. The Company held its earnings call that same afternoon. In response to an analyst question about whether the delay was the result of Nektar experiencing enrollment problems, CMO Mary Tagliaferri misleadingly brushed aside concerns and assured the analyst that the Company was not far off on its original projections:

**Q - Jessica Fye (Analyst)**
Okay. And then, forgive me, if I just didn't, but on the alopecia timing shift from, I

think it used to be first half, then mid-'25, and now back half of '25, is that, like a -- delay of getting sites up and running? Is it screen failure or something? What's kind of behind that timing shift?

**A - Jonathan Zalevsky**
Yeah, so that study began in. Yeah, Mary, you can go ahead.

**A - Mary Tagliaferri**
Yeah. Hi, Jess. This is Mary Tagliaferri. So, as you know, the trial for atopic dermatitis began in October of 2023, and then it was about five months later that we began the alopecia areata study, and those patients are followed for 36 weeks of treatment. ***And so -- I don't think we're necessarily far off from our predictions. I think, we're very close to what we predicted when we started the study. We are enrolling in Canada, the United States, and in Europe. It is true that in any trial these days that you're going to run in immunology and with the globalization process in Europe, it does take longer to bring the European sites on than it is in the U.S., so you certainly start your enrollment earlier in the United States and Canada, but we are on our projected timelines and we'll have the data in the second half of 2025.***[3]

56. The statements in Paragraph 55 above were materially false and misleading when made because: (a) the Company was "far off from [its] predictions" and was not "on [its] projected timeline" in enrolling eligible patients in the study; (b) the statements omitted that the Company was having study completion problems at the time, as revealed later by the high dropout rate, *see* ¶¶84, 92, *infra*; and (c) the statements omitted that the Company had deviated from the study protocol it had specified and provided to the FDA by allowing ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria, including having been diagnosed less than six months prior to enrollment or not having washed out prior medications.

57. On February 4, 2025, Tagliaferri resigned from her position as CMO. She would later return to the same role in September, 2025. While Tagliaferri was away from the Company, Brian Kotzin served as interim CMO.

58. On February 26, 2025, Nektar issued a press release during pre-market hours announcing that it "***has completed target enrollment in its REZOLVE-AA Phase 2b study of rezpegaldesleukin in patients with severe-to-very-severe alopecia areata***." The press release stated, in relevant part:

[3] All emphases are added herein unless otherwise noted.

> Enrollment criteria in the study included a diagnosis of severe-to-very-severe alopecia areata (≥ 50% scalp involvement) as measured using the SALT score at both screening and randomization. ***Patients who experienced an unstable course of alopecia areata over the last 6 months per investigator assessment were excluded from the study.*** Patients with diffuse alopecia and other forms of alopecia were also excluded.

59. The statements in Paragraph 58 above were materially false and misleading when made because: (a) the Company did allow patients into the study who experienced an unstable course of alopecia areata over the prior six months, despite exclusion criteria requiring those patients to be excluded; (b) the statements omitted that enrollment was only "completed" by violating the study protocol Nektar had specified and provided to the FDA by allowing four ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria; and (c) by touting enrollment as "complete" it misleadingly omitted that there were widespread dropouts in the study, as later revealed, *see* ¶¶84, 92, *infra*.

60. On March 12, 2025, the Company held its earnings call for Fiscal Year 2024. The Company disclosed that it lost over $519 million for the year, although its cash balance improved slightly relative to Q3 2024 due to the sale of the Huntsville facility. On that call, Defendants touted the supposed completed enrollment of the REZOLVE-AA study. During his scripted remarks, Defendant Robin boasted regarding the supposed "enthusiasm" for the study among patients:

> **Howard Robin**
>
> ***
>
> ***Our 90-patient REZOLVE-AA study in alopecia areata opened in March of 2024 and completed enrollment in roughly one year. Both studies were completed on schedule in highly competitive clinical trial landscapes for both indications, which I think demonstrates the enthusiasm from patients and physicians for REZPEG's novel mechanism of action and through the data that has been generated to date. JZ will discuss in a minute some of the unique operational features of our studies that are designed to minimize clinical operational risk.***
>
> ***

61. The statements in Paragraph 60 above were materially false and misleading when

made because they omitted that: (a) REZOLVE-AA had only "completed enrollment in roughly one year" despite a "highly competitive clinical trial landscape[]" by including four ineligible patients; (b) the Company had deviated from the study protocol it had specified and provided to the FDA by allowing ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria, including having been diagnosed less than six months prior to enrollment or not having washed out prior medications; (c) the Company was experiencing widespread problems with patients not completing the study as well as problems with enrolling eligible patients, not the "enthusiasm" touted to investors; and (d) as a result, the Company had not "minimize[d] clinical operational risk."

62. During the same call, with specific respect to the REZOLVE-AA trial, Defendant Zalevsky reiterated that patients needed to have had severe alopecia for at least six months in order to be eligible for REZOLVE-AA:

***

> Last month, we announced enrollment completion for our 90-patient Phase 2b study in alopecia areata. The trial recruited patients across approximately 30 global sites.
>
> ***Patients had to present with severe-to-very-severe disease to find at SALT 50 to SALT 100 for at least six months in order to be eligible for inclusion.***

***

63. The statements in Paragraph 62 above were materially false and misleading when made because they omitted that: (a) the referenced exclusion criteria were not enforced; and (b) the Company had deviated from the study protocol it had specified and provided to the FDA by allowing ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria, including having been diagnosed less than six months prior to enrollment or not having washed out prior medications.

64. On May 8, 2025, Nektar announced its financial and operating results for the First Quarter of 2025. The Company announced a $50.9 million net loss, and cash and marketable

securities fell to $220.7 million, down from $269.1 million the previous quarter.

65. That same day, the Company held an earnings call with investors. During that call, with respect to the REZOLVE-AA trial, Defendant Zalevsky reassured investors that "[p]atients had to present with severe to very severe disease define [sic] the severity of Alopecia Tool score or SALT 50 to SALT 100 for at least six months in order to be eligible for inclusion."

66. The statements in Paragraph 65 above were materially false and misleading when made because they omitted that: (a) the referenced exclusion criteria were not enforced; and (b) the Company had deviated from the study protocol it had specified and provided to the FDA by allowing ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria, including having been diagnosed less than six months prior to enrollment or not having washed out prior medications.

67. On July 2, 2025, Nektar exploited the artificial price maintained by its Class Period misrepresentations and omissions to raise $115 million in a secondary public offering of its common stock (the "July 2025 Offering"). In the July 2025 Offering, Nektar sold 4,893,618 shares of common stock, including 638,298 shares sold upon exercise in full of the option provided to underwriters. The July 2025 Offering provided a desperately needed influx of capital to sustain operations.

68. On July 29, 2025, Nektar issued a press release announcing that the U.S. Food and Drug Administration had granted Fast Track designation for REZOLVE-AA. According to the FDA, Fast Track review includes:

- More frequent meetings with FDA to discuss the drug's development plan and ensure collection of appropriate data needed to support drug approval;
- More frequent written communication from FDA about such things as the design of the proposed clinical trials and use of biomarkers;
- Eligibility for *Accelerated Approval and Priority Review, if relevant criteria are met*;
- *Rolling Review*, which means that a drug company can submit completed sections of its Biologic License Application (BLA) or New Drug Application (NDA) for review by FDA, rather than waiting until every section of the NDA is completed before the entire application can be reviewed. BLA or NDA review usually does not begin until the drug company has submitted the entire application to the FDA.

(emphases original). *See* https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/fast-track

69. In the Company press release announcing Fast Track review, Nektar emphasized these advantages of Fast Track review, including the more frequent meetings and interactions with the FDA to discuss the REZPEG Alopecia Areata development plan.

70. On August 7, 2025, Nektar hosted a conference call with investors and analysts to discuss its financial and operating results for the Second Quarter of 2025. The Company announced earlier that day that in the Second Quarter of 2025, Nektar had lost another $41.6 million in net income, and its cash and marketable securities balance had fallen to just $175.9 million.

71. During the earnings call, Defendant Zalevsky stated the following regarding the progress and prospects of the REZOLVE-AA trial:

***

> ***The Phase IIb REZOLVE-AA trial completed enrollment in February and we're excited to share top line results in December.***
>
> In this trial, in patients with severe to very severe alopecia areata, REZPEG is being evaluated at doses of 18 microgram per kilogram or 24 microgram per kilogram every two weeks versus placebo.

***

72. The statements in Paragraph 71 above were materially false and misleading when made because they omitted that: (a) REZOLVE-AA had only "completed enrollment" by including four ineligible patients; and (b) the Company had deviated from the study protocol it had specified and provided to the FDA by allowing ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria, including having been diagnosed less than six months prior to enrollment or not having washed out prior medications.

73. On November 6, 2025, Nektar hosted a conference call with investors and analysts to discuss its financial and operating results for the Third Quarter of 2025. The Company announced earlier that day that it had another large net loss that quarter of $35.5 million in the Third Quarter of 2025, although cash and marketable securities increased to $270.2 million due

to the secondary offering.

74. During the earnings call that day, Defendant Robin continued to tout the progress and prospects of the REZOLVE-AA trial, stating, in relevant part:

> ***
>
> Importantly, in December, we plan to present the top line results from the Phase 2b RESOLVE-AA study in patients with alopecia areata. ***This study enrolled approximately 90 patients with severe to very severe alopecia areata with strong Phase 2 results in the dermatological setting of atopic dermatitis, we're optimistic about the second dermatological setting for REZPEG.***
>
> ***

75. The statements in Paragraph 74 above were materially false and misleading when made because they omitted that: (a) REZOLVE-AA enrolled four ineligible patients; and (b) the Company had deviated from the study protocol it had specified and provided to the FDA by allowing ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria, including having been diagnosed less than six months prior to enrollment or not having washed out prior medications.

76. During the same call, Defendant Zalevsky likewise touted the progress and prospects of the REZOLVE-AA trial, while again falsely reassuring that strict exclusion criteria had been enforced:

> ***
>
> And now turning to alopecia areata, we are on track and look forward to reporting data from the Phase 2b study in December of this year. A positive outcome here would reinforce the potential of REZPEG to provide a completely new treatment paradigm for patients with chronic dermatological diseases. The REZOLVE-AA trial was initiated in March 2024. A total of 94 patients with severe to very severe alopecia areata who have not received the JAK inhibitor or other biologic were randomized to two different dose regimens of REZPEG, 24 microgram per kilogram every two weeks and 18 microgram per kilogram every two weeks or placebo. . . .
>
> ***As a reminder, patient eligibility for this study was determined using the SALT score both screening and randomization. Patients who experienced an unstable course of alopecia areata over the last six months per investigator assessment were excluded from the study and patients with diffuse alopecia and other forms of alopecia were also excluded.***

***

77. The statements in Paragraph 76 above were materially false and misleading when made because: (a) they failed to disclose that in fact, ineligible patients had been enrolled in the study; (b) they failed to disclose that the Company had deviated from the study protocol it had specified and provided to the FDA by allowing ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria, including having been diagnosed less than six months prior to enrollment or not having washed out prior medications; and (c) "[p]atients who experienced an unstable course of alopecia areata" over the prior six months were allowed in the study, despite study protocol requiring their exclusion.

78. On November 20, 2025, Nektar spoke at an investor forum hosted by Jefferies. There, Zalevsky, again in response to a question by an analyst, said that the study was expecting a readout within the next month and that the study looked at patients who had been severe alopecia areata for at least six months:

> **Question – Roger Song (Analyst)**:
> Awesome. JZ, we have a lot to cover because Nektar has an exciting moment, and you just had a lot of the momentum, and then into 2026, and then toward the end of the year, you have a lot going on. So why don't we just go right into it? So, most[ly] near term, you are about to read out the Phase 2b, alopecia areata from your REZPEG. So maybe just set the stage, what's your expectation? You have been guiding -- maybe just remind us what you want to see in that data readout.
>
> **Answer – Jonathan Zalevsky**:
> Yes, sure. Maybe I'll just take a moment to describe the study and the trial design. So the study is a trial where we enrolled just under 100 people that have severe to very severe alopecia areata. So the baseline is a SALT 50 or higher. ***So this is effectively the same patient population, as you saw, that was randomized and treated in the JAK inhibitor studies, multiple JAK inhibitors that have been approved in this space. It's the same patient population.***
>
> ***We're also looking at people that have had at least a six-month duration episode, but we know patients that are in the severe category are typically patients that have a multi- year of their current episode***.

***

79. The statements in Paragraph 78 above were materially false and misleading when made because: (a) the patient population for REZOLVE-AA was not "the same patient population" as JAK inhibitor trials that led to approvals; (b) the statements failed to disclose that ineligible patients were allowed to enroll in Nektar's study; (c) they were not merely "looking at people that have had at least a six-month duration episode," since patients with less than that duration were allowed in the study despite a protocol requiring their exclusion; and (d) the statements omitted that the Company had deviated from the study protocol it had specified and provided to the FDA by allowing ineligible patients to participate despite violating black-and-white inclusion and exclusion criteria, including having been diagnosed less than six months prior to enrollment or not having washed out prior medications.

80. In the lead-up to the data readout for REZOLVE-AA, Defendants noted and analysts recognized that success would depend in part on whether the SALT decline matched that observed in clinical trials for 2 mg Olumiant. The mean placebo-adjusted SALT decline for Olumiant in its two low dose trials was approximately 24%; while the SALT-20 rate was around 16% net of placebo. *See* ¶48, *supra*. Analysts paid attention to these figures; for example, Piper Sandler wrote in October 2025 that "the bar for success is for REZPEG to show a placebo adjusted [] ~20-25% reduction in mean SALT score." Analysts also noted the importance of the percentage of patients achieving SALT-20 (meaning they had regrown hair on 80% of their head). For example, in a November 2025 report, Citi projected that if the SALT-20 rate net of placebo were reported to be below 10%, then the stock price would drop 5-10%.

**III. The Truth Begins to Emerge As Nektar Discloses REZOLVE-AA Failed to Achieve A Statistically Significant Response Due to Ineligible Patients**

81. The truth began to emerge on December 16, 2025, when Nektar issued a press release during pre-market hours announcing topline results for REZOLVE-AA. The press release disclosed that the trial failed to reach statistical significance, which Nektar attributed to the inclusion of four protocol-ineligible patients, stating, in relevant part:

> ***Four of 92 patients included in the modified intent-to-treat (mITT) analysis were found to have major study eligibility violations that should have disqualified them for randomization into the trial.***

82. The placebo-adjusted mean SALT decline was reported to be 19.1 for the 18 µg/kg dose and 17.0 for the 24 µg/kg dose. According to the Company, 5.5% of the placebo response came from the ineligible patient in the placebo group, creating stronger-than-expected results in the placebo arm, which the Company said harmed the comparison with the dosed arms. As a result, REZOLVE-AA failed to match the placebo-adjusted SALT decline observed in clinical trials of 2 mg Olumiant of approximately 24%. The Company admitted that including the ineligible patients caused the failure to reach statistical significance. Biotech research investment newsletter Clinical Catalysts wrote that the results were "close, but not statistically significant. And in biotech, close is often treated the same as failure. The market reacted accordingly."[4]

83. That same day, Nektar hosted a conference call with investors to discuss the REZOLVE-AA trial results. During that call, Tagliaferri admitted that the "***four patients should never have been enrolled in the trial***." Tagliaferri provided additional information regarding the protocol eligibility violations, disclosing that 2 out of the 4 ineligible patients, one on placebo and one on the stronger REZPEG 24 micrograms per kilogram dose, had "had unstable alopecia areata ***with their initial disease being diagnosed less than six months prior to randomization***." Tagliaferri admitted that it was "***important***" to exclude these patients from the study because "alopecia areata is considered unstable when patients have a diagnosis for less than six months because of the unpredictable nature, if it's [sic] autoimmune response, which can fluctuate in the early months with periods of hair loss and regrowth." Tagliaferri further admitted "***it's standard practice to exclude these patients from AA [alopecia areata] studies***." Tagliaferri also conceded that there were two additional protocol-ineligible patients allowed in the study, one in the 18 micrograms per kilogram and one patient in the 24 micrograms per kilogram dose, that violated exclusion criteria because they "initiated treatment before completing the prerequisite eight week

[4] https://clinicalcatalysts.substack.com/p/nektar-therapeutics-nktr-thesis-update?utm

washout period for other AA medications." Defendants also expressly acknowledged on the call that the enrollment protocol had been violated.

84. Defendants also admitted to widespread enrollment problems and patients not completing the study. Specifically, the Company admitted in its corporate presentation that day that 36 out of 92 patients in the study had discontinued early.

85. Importantly, the SALT-20 score also failed to reach Olumiant's ~16% SALT-20 figure net of placebo:

| **Treatment** | **SALT ≤20** | **Placebo SALT ≤20** | **Placebo-Adjusted** |
|---|---|---|---|
| REZOLVE-AA 18 µg/kg (low dose) | 14.8% | 6.7% | +8.1 pts |
| REZOLVE-AA 24 µg/kg (high dose) | 15.6% | 6.7% | +8.9 pts |
| Olumiant 2 Mg Brave-AA1 study | 22.8% | 6.2% | +16.6 pts |
| Olumiant 2 Mg Brave-AA2 study | 19.4% | 3.3% | +16.1 pts |

As Citi predicted just weeks earlier, the stock price dropped amidst this failure.

86. As a result of Nektar's disclosures, its stock price fell $4.14 per share, or 7.77%, to close at $49.16 per share on December 16, 2025.

87. Commentators attributed the stock price decline to REZOLVE-AA's failure to reach statistical significance amidst eligibility violations. Investing.com noted "Nektar stock falls after Phase 2b alopecia trial misses primary endpoint." Benzinga reported that Nektar shares were trading lower following the REZOLVE-AA readout, which missed its primary endpoint in the full patient population. BioPharma Dive, a leading biopharmaceutical industry publication, noted that the study's results were "sending Nektar shares down."

88. Analysts called the protocol violations "major" and explicitly attributed the decline in Nektar's stock price to the inclusion of the four ineligible patients allowed in the REZOLVE-AA trial. For example, a December 16, 2025 Piper Sandler report stated that Nektar

"is currently trading down ***given n=4 patients had major study eligibility violations***," and BTIG issued a report stating that "[w]e believe the muted stock reaction" was "explained solely by" the inclusion of the four patients with major study eligibility violations. Seeking Alpha noted that the results failed to trigger a stock market rally amongst concerns about the failure to achieve statistical significance.

89. As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## IV. Additional Allegations of Scienter

90. Several facts demonstrate that Defendants knowingly made false statements or, at a minimum, acted with deliberate recklessness as to the truth or falsity of their Class Period representations to investors.

### A. Defendants had actual knowledge of and access to information contradicting their public statements

91. The Defendants had knowledge of the ineligible patients because they closely monitored patient data. Tagliaferri and Zalevsky have each explained in investor calls that the Company monitored patient data closely, noting that the Company has "a very large safety database with over 1000 patients dosed in an inflammatory skin disease." *See* Nektar May 7, 2026 Earnings Call Transcript; *see also* Nektar Therapeutics Analyst and Investor Event To Discuss REZOLVE-AA Topline Results Call, December 16, 2025.

92. CW1 was a Senior Medical Director (Consultant) in Clinical Development at Nektar from April 2025 through December 2025. CW1 was hired to oversee the REZOLVE-AD trial. CW1 reported to the VP of Clinical Development Sohail Chaudry ("Chaudry"), who served as medical monitor for the REZOLVE-AA trial while its senior medical director was on leave from May through October of 2025. While Chaudry was overseeing the REZOLVE-AA trial, CW1 joined REZOLVE-AA calls with Chaudry upon his request. CW1 states that Chaudry reported to Tagliaferri—who CW1 explains had been away from the Company but returned

during CW1's tenure. CW1 explains that Chaudry oversaw enrollment. According to CW1, during the first month of the trial, patients were required to visit the testing facility once per week for testing, which can take several hours. After the first month, the visits became less frequent. From calls with Chaudry, CW1 recalls some patients dropped out of the study and hence did not follow all of the requirements of the study. CW1 added that patients missing visits were a concern and the clinical team made every effort to track any missing patients in the study.

93. According to CW1, the medical monitor was tasked with monitoring the patients' data. Chaudry reviewed the data frequently, working closely with the CRO team, and reported to senior management, which included the CMO, often.

94. According to CW1, the clinical team also had monthly meetings, which sometimes included the CMO, and Mary Tagliaferri or Brian Kotzin either attended or there would be a separate meeting between the CMO and Chaudry.

### B. Defendants Held Themselves Out As Knowledgeable on Patient Enrollment and Exclusion Criteria

95. Before, during and after the Class Period, Defendants made statements demonstrating actual knowledge of the underlying facts that rendered their representations regarding REZOLVE-AA's enrollment and patient screening misleading.

96. For example, Tagliaferri spoke at the May 9, 2024 Earnings Call about how the FDA requires washout periods of 5.5 half-lives, which meant for biologics the washout period would need to be around twelve weeks. Tagliaferri also explained on the December 16, 2025 investor call how it is "standard practice to exclude" patients who had been diagnosed fewer than six months prior to enrollment and randomization. Similarly, in the standard of care alopecia areata treatments, the sponsor also excluded those with unstable alopecia areata for fewer than six months—thus, it also required six months of severe alopecia. The same six-month exclusion criteria were also present in other JAK inhibitors Litfulo, Leqselvi, and Olumiant.

97. Zalevsky, Robin, and Tagliaferri also spoke publicly in detail about patient enrollment. *See, e.g.*, ¶¶55, 60, 62, 71, 74, 76, 78, 83.

98. Tagliaferri was also asked specifically whether there had been a screening failure in November 2024, and brushed aside concerns by stating that they remained on track relative to their projections. By responding to securities analysts about the subject of the fraud with a high degree of specificity, the Individual Defendants affirmed that they were sufficiently knowledgeable to address these topics and to answer the analysts' questions, which further supports a strong inference that they knew or recklessly disregarded the true facts concerning the severe problems with the REZOLVE-AA study.

99. Nektar's Fiscal Year 2024 Form 10-K, which was signed by CEO Robin, acknowledged the critical importance and responsibility for adhering to protocols. It said: "we are responsible for ensuring that each of our clinical trials is conducted in accordance with the general investigational plan and protocols for the trials," rather than merely relying on a third party CRO. These same statements were repeated in the Company's quarterly reports filed on 10-Q throughout the Class Period. These statements show the Company and Robin took ownership of the screening and monitoring of recruitment and the Defendants had knowledge of the subjects that they concealed from investors.

**C. Core Operations**

100. Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned the core operations of Nektar. The clinical testing of REZPEG was a core operation of Nektar during the Class Period, as it was a small company of barely 60 employees at the time. In addition, Nektar consistently referred to REZPEG as its lead product candidate and emphasized in its SEC filings that its success as a company "was highly dependent on the success of rezpegaldesleukin [REZPEG]." The commercialization of REZPEG was thus paramount to the Company.

101. Additionally, the Individual Defendants were active in all aspects of the business. For these reasons, it would be absurd to assume that Defendants were unaware of the critical eligibility violations of the patients in the REZOLVE-AA study.

**D. The Defendants Were Motivated to Commit Fraud Due to the Precarious Position of the Company**

102. The Company had not had a drug candidate approved by the FDA since 2015. As the Class Period began, the Company had just lost over $500 million in the previous Fiscal Year, and was quickly running out of money. Meanwhile, the Company had already sold off marketable assets and had no other source of cash other than from raising capital from investors or through partnerships. Otherwise, the Company would run out of money that year. Faced with repeated failures, Defendants were looking at a looming crisis. They had two choices: admit that there were ineligible patients in the REZOLVE-AA study and jeopardize the much-needed secondary offering, or hide that known truth and gamble that the protocol violations would not doom trial results.

103. At the Q1 2025 earnings call on May 8, 2025, when asked if Nektar could take REZPEG into a Phase 3 trial, Robin acknowledged the Company's precarious financial condition and its inability to execute on a Phase 3 trial: "look, if you look at Nektar's current financial position, we clearly aren't in a position to execute on a full Phase three program without a partner." As Summer of 2025 progressed, the Company consummated a secondary offering on July 2, 2025 for gross proceeds of $115 million, and then initiated a $75 million at-the-market sale between September 23 and October 16, 2025. At no point during the Company's raising of $190 million did it disclose to investors that the REZOLVE-AA study was compromised because of ineligible patients in the study.

**E. Robin and Zalevsky's Insider Sales and Compensation Packages Boost an Inference of Fraud**

104. During the Class Period, Robin took advantage of Nektar's artificially inflated stock price to reap nearly $800,000 in insider sales.

105. Robin profited from stock sales in a manner that was unusual compared with his prior trading history. In the same 13-month period before the Class Period, Robin had not sold any Nektar shares, other than to cover tax withholdings. However, towards the end of the Class Period, he began aggressively selling shares and realized nearly $800,000 in proceeds:

| Robin's sale dates | Shares sold | Price | Approx. gross proceeds |
|---|---|---|---|
| 9/2/2025 | 1,500 | $30.16 | $45,240.00 |
| 9/4/2025 | 1,923 | $32.37 | $62,247.51 |
| 9/4/2025 | 1,496 | $33.54 | $50,175.84 |
| 9/4/2025 | 613 | $34.40 | $21,087.20 |
| 9/4/2025 | 1,134 | $35.80 | $40,597.20 |
| 9/5/2025 | 3,304 | $37.87 | $125,122.48 |
| 9/5/2025 | 2,226 | $38.82 | $86,413.32 |
| 9/5/2025 | 1,136 | $39.89 | $45,315.04 |
| 9/9/2025 | 2,100 | $45.16 | $94,836.00 |
| 9/9/2025 | 1,200 | $46.41 | $55,692.00 |
| 9/9/2025 | 2,156 | $47.49 | $102,388.44 |
| 9/9/2025 | 1,210 | $48.18 | $58,297.80 |
| **TOTAL** | **19,998.00** | N/A | **$ 787,412.83** |

106. Notably, the value of Robin's Class Period sales was over 71% of his base salary in 2025. The sales made in September 2025 were pursuant to trading plans entered into six months after the Class Period, when Defendants already possessed the material non-public information that they omitted from their statements to investors. Robin sold all shares available for sale under the trading plan in September 2025. During the Class Period, Robin also sold shares to cover tax withholding obligations, but those shares are not included in the chart above.

107. Robin's sales on the eve of the data readout were also out of line with his prior sales, and amounted to nearly 29% of his holdings as of September, 2025 and over 69% of the value of what his holdings were at the beginning of the Class Period.[5]

---

[5] The value of Robin's shares at the beginning of the class period was approximately $1,140,511.30, which was derived from multiplying his holdings at the time (848,358 shares, per the Company's Form 4 disclosure dated August 20, 2024) by the value of his shares of $1.37 at closing on November 7 2024.

108. Similarly, Zalevsky sold 2,206 shares of Nektar during the Class Period, representing over $72 thousand in proceeds. Like Robin, in the same 13-month period before the Class Period, Zalevsky had not sold any Nektar shares, other than to cover tax withholdings:

| **Zalevsky sale dates** | **Shares sold** | **Price** | **Approx. gross proceeds** |
|---|---|---|---|
| 9/2/2025 | 485 | $30.10 | $14,598.50 |
| 9/4/2025 | 793 | $32.43 | $25,716.99 |
| 9/4/2025 | 432 | $33.60 | $14,515.20 |
| 9/4/2025 | 189 | $34.41 | $6,503.49 |
| 9/4/2025 | 307 | $35.69 | $10,956.83 |
| **TOTAL** | **2,206** | N/A | **$72,291.01** |

109. Zalevsky similarly sold shares in September 2025 that were pursuant to a trading plan entered into six months after the Class Period began. Zalevsky also traded to satisfy tax obligations before and during the Class Period, but those shares are excluded from the above analysis. Zalevsky's sales on the eve of the data readout, were also out of line with his prior sales, and amounted to over 21% of the value of what his holdings were at the beginning of the Class Period.[6]

110. Both also benefited in other financial ways from hiding damaging information about protocol violations. In Fiscal Year 2024, in the Company's Performance Objectives for Determining Executive Compensation, the most heavily weighted category was REZPEG's development, and expressly included the objective that the Company "Maintain schedule for Phase 2b study of rezpegaldesleukin in alopecia areata." Had they told the truth, the ineligible patients would need to be removed and replaced with eligible patients, jeopardizing that timeline.

[6] The value of Zalevsky's shares at the beginning of the class period was approximately $343,601.48, which was derived from multiplying his holdings at the time (approximately 250,804 shares, according to the Company's August 20, 2024 Form 4 disclosure) by the value of his shares of $1.37 at closing on November 7, 2024.

Thus, Robin and Zalevsky were incentivized to claim that enrollment was complete even though the Company had ineligible patients in the study.

### F. The Temporal Proximity and Sharp Divergence Between Defendants' Misleading Statements and the Emergence of the Truth Further Bolsters an Inference of Scienter

111. The temporal proximity and sharp divergence between Defendants' misleading statements and subsequent disclosures further support an inference of scienter.

112. For example, on November 6, 2025, Zalevsky said that persons with unstable alopecia areata over the last six months were excluded. Zalevsky substantially repeated the same statements two weeks later on November 20, 2025, both times withholding that there were patients in the study who had been diagnosed fewer than six months prior to enrollment and randomization. Robin similarly trumpeted the study at the November 6, 2025 call, and signaled his "optimism" to investors about the imminent data release.

113. Just five weeks later, the Company admitted that REZOLVE-AA had failed to achieve statistical significance due to the same enrollment issues that Defendants were hiding from investors until the very end of the Class Period. The temporal proximity between Defendants' rosy statements about enrollment and screening, and Defendants' admission that ineligible patients were in the REZOLVE-AA study, enhances the inference of scienter.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

114. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased or otherwise acquired Nektar common shares on the NASDAQ or another United States trading venue between November 8, 2024 and December 15, 2025, both dates inclusive, and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

115. The members of the Class are so numerous that joinder of all members is impracticable. Nektar had over 28 million common shares outstanding and approximately 130 holders of record as of the end of Fiscal Year 2025, representing a far higher number of beneficial owners whose brokers hold their shares in "street name." Throughout the Class Period, Nektar's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nektar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

116. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

117. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

118. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the clinical trials of Nektar's drug candidates;
- whether the Individual Defendants were control persons of Nektar during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Nektar's common shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what

is the proper measure of damages.

119. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

120. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Nektar's common shares traded in an efficient market;
- the Company's shares were liquid and traded with heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and
- Plaintiff and members of the Class purchased, acquired, and/or sold Nektar common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts materialized or began to emerge, without knowledge of the omitted or misrepresented facts.

121. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

122. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the claims asserted herein sound primarily in omission rather than affirmative misrepresentation.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

123. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

125. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of Nektar common shares. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Nektar common shares; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Nektar common shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

126. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially misleading statements described above that were designed to influence the market for Nektar common shares. The statements described above were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nektar's lead product candidate's clinical efficacy and exposure levels of the drug.

127. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

128. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives of Nektar, the Individual Defendants had knowledge of the details of Nektar's internal affairs and operations throughout the Class Period.

129. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of Nektar's public statements. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nektar's viability as a company. As a result of the dissemination of the aforementioned false and misleading statements, the market price of Nektar common shares was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Nektar's most important clinical trial for its leading drug candidate, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Nektar common shares at artificially inflated prices and relied upon the price of the common shares, the integrity of the market for the common shares and/or upon statements disseminated by Defendants, and were damaged thereby.

130. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common shares, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or

acquisitions by Plaintiff and the Class, the true value of Nektar common shares was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Nektar common shares declined upon public disclosure or materialization of the concealed risks alleged herein to the injury of Plaintiff and all other Class members.

131. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

132. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's common shares during the Class Period, upon the disclosure or materialization of the concealed risks on the dates identified in this Amended Complaint.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against Robin and Zalevsky**

133. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134. During the Class Period, Robin and Zalevsky, as CEO and Chief R&D Officer, respectively, not only participated in but dominated the operation and management of Nektar, and participated, directly and indirectly, in the conduct of Nektar's business affairs. Because of their roles and responsibilities as Nektar's most senior executives, they knew the adverse non-public information that rendered Nektar's public statements false and misleading.

135. As officers and/or directors of a publicly owned company, Robin and Zalevsky had a duty to disseminate accurate and truthful information with respect to Nektar's business and results of operations, and to correct promptly any public statements issued by Nektar which had become materially false or misleading.

136. Because of their positions of control and authority as senior officers, and the fact that they exercised such control in the day-to-day conduct of Nektar's affairs, Robin and Zalevsky

were able to, and did, control the Company's statements which Nektar disseminated in the marketplace during the Class Period concerning Nektar's business, financial results and operations. Throughout the Class Period, Robin and Zalevsky exercised their power and authority to cause Nektar to engage in the wrongful acts complained of herein. Robin and Zalevsky, therefore, were "controlling persons" of Nektar within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nektar common shares.

137. Robin and Zalevsky also culpably participated in the misrepresentations to investors as alleged in Count I. They each therefore acted as a controlling person of Nektar. By reason of their senior management positions at Nektar, Robin and Zalevsky had the power to direct the actions of, and exercised the same to cause, Nektar to engage in the unlawful acts and conduct complained of herein. Robin and Zalevsky exercised control over the general operations of Nektar and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiff, and the other members of the Class complain. As control persons of a publicly owned company, Robin and Zalevsky each had a duty to disseminate accurate and truthful information with respect to REZOLVE-AA, and to promptly correct any public statements issued by Nektar which had become materially false and/or misleading.

138. By reason of the above conduct, Robin and Zalevsky are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nektar.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 31, 2026

**POMERANTZ LLP**

By: */s/ Brian P. O'Connell*

Joshua B. Silverman (*pro hac vice forthcoming*)
Brian O'Connell (SBN: 314318)
10 S. LaSalle St., Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
jbsilverman@pomlaw.com
boconnell@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

*Counsel for Lead Plaintiff Michael Schramke and Lead Counsel for the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2026, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

Dated: August 31, 2026

**POMERANTZ LLP**

By: */s/ Brian P. O'Connell*
Brian P. O'Connell